# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**INOFIN, INCORPORATED,**                          Chapter 7
    Debtor                                Case No. 11-11010-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Motion by Raymond C. Green, Inc. for Relief from the Automatic Stay and for Related Relief" (the "Motion").  Pursuant to its Motion, Raymond C. Green, Inc. ("RCG") seeks a determination that the automatic stay does not apply to RCG's rights with respect to a portfolio of motor vehicle retail installment contracts, which were assigned to it by Inofin, Incorporated  (the "Debtor" or "Inofin") purportedly to secure loans to Inofin in excess of $8 million, or, in the alternative, relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to obtain that portfolio which RCG contends was its collateral and the subject of valid, prepetition foreclosure sales.  RCG seeks a finding that it is entitled to possession of the portfolio, including, without limitation, all of the proceeds of the portfolio and all documents, books and records in the possession of the Chapter 7 Trustee relating to the portfolio, by reason of two foreclosure

sales conducted prior to the entry of the order for relief.[1]

The Chapter 7 Trustee filed an Objection to the Motion, and the Court conducted an evidentiary hearing on May 16, 2011. At the hearing, six witnesses testified and 38 exhibits were accepted into evidence.

The issues presented include whether RCG has a valid security interest in the portfolio of retail installment contracts assigned to the Debtor by various automobile dealers, and whether its foreclosure sales divested the estate of an interest in the portfolio. Resolution of those issues in RCG's favor will determine whether it has established a colorable claim to relief under 11 U.S.C. § 362(d). *See* Grella v. Salem Five Cent Savs. Bank, 42 F.3d 26, 32 (1st Cir. 1994) ("The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.").

The parties have extensively briefed the issues. The Court now makes the following findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

---

[1] To the extent RCG, in effect, is seeking a determination of the validity and extent of its lien, it was required to commence an adversary proceeding. *See* Fed. R. Bankr. P. 7001(2). The Trustee, however, did not raise that procedural issue. *See* Aegean Fare, Inc. v. Comm. of Mass. Dept. of Revenue (In re Aegean Fare, Inc.), 33 B.R. 745, 746 n.1 (Bankr. D. Mass. 1983). Due to the extensive briefing of the issues relating to the validity and extent of RCG's lien, the Court concludes that the parties consented to the determination of those issues in the context of RCG's Motion.

## II. FACTS

On February 9, 2011, approximately 38 creditors holding claims in the stated amount of $12,927,517.75 filed an involuntary petition against Inofin.  In an Emergency Motion for the Appointment of an Interim Chapter 7 Trustee, they alleged that the Debtor was a licensed financial service company, specializing in providing financing for used motor vehicle sales that did not meet traditional financing criteria, that the Debtor primarily funded its lending activities through borrowings from numerous individuals and entities, including the petitioning creditors, and that it had loan obligations of approximately $70 million owed to approximately 200 creditors.  RCG, the Debtor's largest lender, filed a Statement in Support of the Emergency Motion in which it observed that "[u]nless these loans are continually serviced, their value will decline precipitously."

Although the Court initially denied the Emergency Motion for multiple reasons stated on the record, including the absence of a return of service of the involuntary summons, the Court, on February 16, 2011, entered an order for relief. Mark G. DeGiacomo (the "Trustee") was appointed interim trustee and his appointment became permanent when creditors did not request an election of a trustee at the section 341 meeting of creditors held on April 19, 2011.

RCG and Inofin, then known as First Investors Factoring, Inc., commenced their lending relationship in April of 1996.  During the 15 years in which they engaged in business, they executed a number of documents pertinent to the resolution of the issues before the Court.  A discussion of the documents and the parties' practices follows.

3

The Promissory Notes

The documents executed by RCG and Inofin included four promissory notes in favor of RCG executed by Inofin as follows:

> 1) a $400,000 promissory note, dated April 18, 1996, due and payable on April 18, 2011 with a principal balance of $45,578.39 at the foreclosure date;
>
> 2) a $7 million promissory note, dated May 2, 2008, due and payable on May 2, 2010, with a balance of $1,970,339.15 at the foreclosure date;
>
> 3) an $8 million promissory note, dated August 21, 2009, due and payable on August 21, 2011, with a balance of $ 6,019,257.59 at the foreclosure date;
>
> 4) a $200,000 promissory note, dated January 8, 2010, due and payable on January 8, 2013, with a balance of $141,486.27 at the foreclosure date.

The parties stipulated that "[a]s of May 16, 2011, the principal amount of RCG's debt shall be deemed to be $8,176,661.40 subject to a $4,000,000 credit if RCG's bid at the foreclosure sale is determined by this Court to be valid."[2]

The first three promissory notes expressly provide: "Secured by a Security Agreement dated April 17, 1996." The most recent note dated January 8, 2010 provides: "Secured by a Security Agreement dated April 17, 1996 and by the accounts set forth on the Allonge attached hereto."[3]

---

[2] The parties did not specify the date of the foreclosure sale. RCG conducted two foreclosure sales, one on January 18, 2011 and the other on January 26, 2011.

[3] The Allonge was captioned "Accounts Securing $200,000 Promissory Note Dated January 8, 2010" and contained a chart setting forth 34 accounts identified by account number, the names of the motor vehicle purchasers, the Inofin Partial Purchase Amount, the number of payments purchased, and the NADA value of the motor vehicle.

Additionally, the notes contained provisions relative to defaults.  They provided the

following:

> At the option of the holder, this note shall become immediately due and payable without notice or demand upon the occurrence at any time of the following events:  (1) Default in any payment of principal or interest which is not cured within seven (7) days; (2) Default, for more than 21 days after notice thereof from holder to Marker, no cure having been effected, in the performance or observance of the terms or conditions of the Security Agreement or other instruments and documents . . . securing this note; (3) Default for more than 21 days after notice thereof from holder to Maker, no cure having been effected, in the payment or performance of any other liability or obligation of the Maker to the holder; (4) Service, pursuant to trustee process, upon the holder hereof of a writ in which the holder is named as trustee of at least $10,000 of the Maker; (5) If the Maker is a corporation, trust or partnership, the liquidation, termination or dissolution of any such organization; or (6) If the Maker shall make an assignment for the benefit of creditors, or if a receiver of all or substantially all of Maker's property shall be appointed and not dismissed within 60 days, or if a petition in bankruptcy or other similar proceeding under any law for relief of debtors shall be filed by or against  . . . Maker.

<u>The Security Agreement</u>

The Security Agreement, dated April 17, 1996, referenced in all four promissory

notes, provided in pertinent part the following:

> First Investors Factoring, Inc., a Massachusetts corporation with a place of business at 55 Accord Park Drive, Rockland, MA 02370 ("Debtor"), subject to the terms and conditions hereof, hereby grants a security interest to Raymond C. Green, Inc. (the "Secured Party"), in and to the following property, whether now owned or hereafter acquired:

>> (i) all of the Debtor's rights in and to chattel paper, instruments and all motor vehicle installments sales contracts *purchased by Debtor with the proceeds of loans from Secured Party and assigned and delivered to Secured Party*;

>> (ii) all collateral security for and all guaranties of, and all

5

proceeds of, any of the foregoing.

(iii) all documents, books and records relating to the foregoing.

The property described above shall hereafter be collectively referred to as the "Collateral".

The Collateral is pledged, assigned, mortgaged and transferred, and a security interest therein is granted, to the Secured Party as security for payment of all sums due under a promissory note (the "Note") of Debtor in the original principal amount of $500,000.00 of even date herewith and as security for any and all obligations and liabilities of Debtor to the Secured Party of every kind, direct or indirect, absolute or contingent, due or becoming due, now existing or hereinafter arising  (hereinafter collectively referred to as the "Obligations").

(emphasis supplied).

In addition to the provisions of the Security Agreement reproduced above, the Security Agreement contained additional provisions through which the Debtor 1) agreed to provide RCG the right to examine and inspect and make extracts from its books and other records and "to arrange for verification of accounts, under reasonable procedures, directly with account debtors or by other methods;" 2) irrevocably appointed RCG its "true and lawful attorney . . . with full power of substitution, in the name of the Secured Party or in the name of the Debtor or otherwise, for the sole benefit of the Secured Party, but at the sole expense of the Debtor, in the event of default . . . ;" 3) granted RCG the rights and remedies of a secured party under the Uniform Commercial Code and agreed that any notification of a sale or disposition of the Collateral would be deemed reasonable "if given at least ten (10) days before the time of such public sale, or the date after which any such

private sale or other intended disposition is to be made . . . ;" and 4) agreed, among other things, to waive demand and notices of any description.  The Debtor expressly agreed to the following:

> TO THE MAXIMUM EXTENT PERMITTED BY LAW DEBTOR ALSO WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE TO JUDICIAL HEARING IN ADVANCE OF THE ENFORCEMENT OF ANY OF THE SECURED PARTY'S RIGHTS HEREUNDER, INCLUDING WITHOUT LIMITATION, THE SECURED PARTY'S RIGHTS FOLLOWING AN EVENT OF DEFAULT TO TAKE IMMEDIATE POSSESSION OF THE COLLATERAL AND EXERCISE ITS RIGHTS WITH RESPECT THERETO.

 (capitalization in original).

Additionally, the Security Agreement provided that "[a]ll the Secured Party's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised separately or concurrently."  The Security Agreement, which was prepared by an attorney engaged by RCG, was to be governed by Massachusetts law.  The Security Agreement did not contain a fixed term, but provided that it was "a continuing agreement in every respect," unless terminated by the Debtor subject to certain conditions not present here.

The Financing Statement

RCG filed UCC-1 financing statements with the Secretary of State for the Commonwealth of Massachusetts, the most recent one on April 18, 2006,  with respect to the following:

> All the Debtor's rights in and to chattel paper, instruments and motor vehicle installment sales contracts *purchased by Debtor with the proceeds of loans from Secured Party and assigned and delivered to Secured Party*. All collateral security for and all guaranties of and all proceeds of any of the foregoing.  All documents, books and records relating to the foregoing.

7

(emphasis supplied).

<u>The Loan Agreements</u>

Inofin and RCG also executed two Loan Agreements, the first dated May 2, 2008, and the second dated August 21, 2009, relating to the $7 million and $8 million promissory notes, respectively. The Loan Agreements are identical except for the loan amounts set forth in the agreements and the weekly advances contemplated by the parties pursuant to the agreements. The May 2, 2008 Loan Agreement provided that advances under the $7 million note were to be made once per week in the amount of not less that $50,000 or more than $150,000, while the August 21, 2009 Loan Agreement provided that advances under the $8 million note were to be made once per week in an amount of not less than $50,000 or more than $170,000. Each advance was to be secured by the collateral described in Section 2 of the Agreement, which provides:

> In consideration of, and to evidence and secure the Loan, *Borrower has executed and delivered, or will execute and deliver prior to the first weekly advance*, the following loan documents:
>
> (a) This Agreement.
>
> (b) The Note.
>
> (c) Security Agreement, which was executed on April 17, 1996.
>
> (d) UCC-1 Financing Statements filed with Massachusetts Secretary . . .  and Rockland Town Clerk . . . as continued.

and *prior to or simultaneously with each advance* the following:

8

(e) The Security Documents, as follows:

(i) Original Retail Installment Sale Agreements (the "Installment Contracts" or singularly, an Installment Contract"), in the form of Exhibit 1 attached hereto with the original signature of the Buyer.  The "Buyer" as described therein shall have made a down payment of not less than ten (10%) percent of the sale price of the vehicle described therein (the "Vehicle") and each transaction shall have Vendor's Single Interest Insurance ("VSI Coverage") and extended warranty coverage  (if available), as described therein. Each Installment Contract shall be assigned by the "Seller" as defined therein to the Borrower, utilizing the "RECOURSE ASSIGNMENT" set forth on the reverse side thereof.

(ii) Borrower's *Original* Partial Purchase And Assignment (the "Assignment") in the form of Exhibit 2 attached hereto.   The "Amount Purchased" as set forth therein shall not exceed one hundred ten (110%) percent of the wholesale price of the Vehicle as listed in the most current NADA Price Book plus the premium for VSI Coverage and extended warranty coverage (if purchased).   Lender shall not be obligated to make any one of the advances described in Section 1(a) hereof unless (i) *Borrower is then assigning, to Lender, or Lender already has an Assignment in which the aggregate "amount purchased" equals or exceeds the amount of such advance.*

(iii) Application for Title (the "Application) in the form of Exhibit 3) attached hereto or such form as is currently approved by the Registry of Motor Vehicles.  Each such Application shall be completely filled in, including the insurance certification and shall list the Borrower as the first lien holder.

(iv) Allonge (the "Allonge") from Borrower to
Lender in the form of Exhibit 4 attached hereto
executed by the Borrower.

All of the documents in this Section 2 are called the "Loan Documents" and
those in clauses (c), (d) and (e) are called the Security Documents.

(emphasis supplied).[4]  In Section 9 of the Loan Agreements, the parties agreed that "[n]o

modification or waiver of any provisions of the Loan Documents shall be effective unless

signed in writing by all parties thereto."

The Loan Modification Agreement

On October 1, 2010, several months after Raymond C. Green, the principal of RCG,

learned of an investigation of Inofin by the Securities and Exchange Commission ("SEC")

and concomitantly the Debtor's financial difficulties, the parties executed a Loan

Modification Agreement.  That agreement referenced the May 2, 2008 and August 21, 2009

promissory notes and the two Loan Agreements, "which are all secured by a security

interest, pledge and assignment of Installment Contracts (as defined in the Loan

Agreements)."  These four documents were defined in the agreement as the "Loan

Facility." The parties confirmed that the outstanding principal balances of the 2008 and

2009 Notes as of October 1, 2010 were $1,970,339.15 and $6,019,257.59, respectively, and

that interest was current on both notes.  They agreed that, during the pendency of the SEC

investigation, RCG would reduce the contract interest rate from 13% to 8%; that Inofin

would not be entitled to any advances; and that Inofin would pay interest only on a weekly

---

[4] The parties submitted no evidence that the document caption "Allonge" was
utilized before the May 2, 2008 Loan Agreement.

basis.  The parties further agreed:

> As security for the Loan Facility, on or after the date hereof, Borrower shall
> assign and deliver to Lender, pursuant to Section 2(e) of the Loan
> Agreement, Installment Contracts having an outstanding balance of equal to
> the greater of (i) $10,000,000.00 or (ii) 125% of the outstanding principal
> balance due to Lender under the Loan Facility (both Notes).  With each
> weekly interest payment, Borrower shall certify to Lender the total
> outstanding principal balance of the pledged Installment Contracts and shall
> assign and pledge new Installment Contracts as necessary.  It shall be a
> default under the Notes and Loan Facility if, at any time, the outstanding
> balance of the pledged Installment Contracts is less than is required under
> this Section 4.

Additionally, "[e]xcept as specifically modified" in the Loan Modification Agreement, the
parties ratified, confirmed and approved in their entirety all the loan documents executed
in conjunction with the Loan Facility.  Moreover, they agreed that the Loan Modification
Agreement represented their entire agreement, "supercede[d] all prior discussions, and
may not be modified or amended except by a writing executed by both parties."  In
summary, as a result of the Loan Modification, Inofin was permitted to retain for its own
use payments made by consumers with respect to their Retail Installment Sale Contracts
and was required to pay RCG interest only, on  a weekly basis, under the notes.[5]

Prior to the execution of the October 1, 2010 Loan Modification Agreement, RCG
made weekly advances in the sum of $150,000 until August of 2009, when it  commenced
making weekly advances in the sum of $170,000 against the $8 million note.   RCG

---

[5] The Loan Modification Agreement also provided that Inofin would arrange for
the prompt installation of a computer terminal in RCG's office which was to have
"continuous real-time access to Borrower's computer system" and "at a minimum,
display all of the information relating to the Installment Contracts pledged to Lender
and permit Lender to input data relating to the pledged Installment Contracts."

continued making weekly advances in the sum of $170,000 until July 7, 2010 when the weekly advances ceased.   RCG made one further advance to Inofin in the sum of $170,243.27 under the $8 million note on August 9, 2010.  It did not make any advances to the Debtor after the October 1, 2010 Loan Modification Agreement.   Nevertheless, the Debtor continued to forward Allonges to RCG, with originals of consumer Retail Installment Sale Contracts and copies of Partial Purchase and Assignments attached.

The Parties' Course of Dealing

Two witnesses, Margaret Adams ("Adams")  and Teresa Brown ("Brown"), who were employed by Inofin, testified as to RCG's advances; described the packages of documents, to which a document captioned, "Allonge," served as a both a cover sheet and an assignment of the Retail Installment Sale Contracts; and explained how the packages were transmitted to RCG.  Brown, a former employee in the accounting department  of Inofin and a current employee of the Trustee, who has been authorized to operate the Debtor's business on a limited basis and to use cash collateral, testified that Inofin had one operating account.  She indicated that the account initially was at Citizens Bank, but that that account was closed and replaced in 2009 with an operating account at Bank of America.  According to Brown, Inofin opened an account at Rockland Trust into which RCG wired its weekly advances, which then were deposited and commingled with all other funds in the operating account at Citizens Bank and then Bank of America.  Unlike the Bank of America account, the Rockland Trust account was not an operating account, and Inofin did not make deposits into the account or pay bills from that account.

12

Brown testified that the operating account was used exclusively for deposits from
RCG and all other investors and for buying Retail Installment Sale Contracts from dealers,
the "Seller" identified on the Partial Purchase and Assignments and the Retail Installment
Sale Contracts.  When asked whether any of the Retail Installment Sale Contracts had been
purchased with loans proceeds from RCG, she responded as follows:  "No. In my opinion
there was no way to tell, once - - once funds had been deposited into the account.  It's like
having a swimming pool and dumping buckets and water into it, and telling your kid, 'Go
swim in our water.'"  In other words, the Debtor did not maintain segregated accounts or
keep any records which would permit the use of specific investor funds to be traced and
tied to the acquisition of specific Retail Installment Sale Contracts.  Moreover, RCG did not
direct or monitor how the Debtor utilized its weekly advances.  The Trustee produced
evidence (Trustee's Exhibit 14) of the amount of RCG's funding of the Debtor's acquisition
of Retail Installment Sale Contracts in relation to total deposits in the Debtor's operating
account between January of 2008 and July of 2010.  According to the Trustee, total deposits
equaled $103,040,646, while RCG's funding totaled $21,445,357 or 20.81% of the total
deposits.

Allonge Packages

Brown also testified that Inofin typically would request a loan advance from RCG
on Monday and that an advance was received on Wednesday, at which time Adams would
create an "investor package." RCG submitted an exhibit (RCG Exhibit 3) representing a
typical investor package. Adams indicated that she put together an investor package and

13

a customer file, which would contain, among other things, a Finance Worksheet, the Partial Purchase and Assignment, the vehicle registration, the Retail Installment Sale Contract, and the title for the vehicle.[6] Once created, Adams placed the investor packages in two piles in the Debtor's file room. One pile was restricted to loans purchased from an entity known as DriveUSA. The other pile was organized so that the most recent packages were on top. Once per week, Brown would visit the file room and retrieve 30-35 investor packages. Using a computer program known as InTrack, Brown selected investor packages for assignment to RCG with the objective of utilizing packages with Inofin Partial Purchase Prices totaling at least $170,000. She also stated that she "made sure that the NADA value was at least 110 percent of the Inofin partial purchase price." After making her selections, Brown would then create and print two copies of the Allonge cover sheet and return the packages to Adams. At that point, Adams would replace the copy of the Retail Installment Sale Contract in the package with an original executed contract and attach the Allonge, which referenced a date and account number and which also provided the following:

> In consideration of One Dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Inofin, Inc. *hereby assigns, with full recourse, to Raymond C. Green, Inc., all of its right, title and interest in, to and under the following instruments*:
>
> Retail Installment Sale Agreement dated . . .
> by and between Seller: . . .
> and Buyer: . . .
> with respect to (the "Vehicle") a: . . .

---

[6] Adams testified that in 2008 Inofin processed 40-50 loan packages per week, that in 2009 it processed 30-40 loan packages per week, and that in 2010 it processed less than 30-40 packages per week.

> VIN: . . .
> Inofin, Inc. Partial Purchase and Assignment dated . . . , by and between
> Inofin, Inc. and Raymond C. Green Inc. with respect to the aforesaid Retail
> Installment Agreement and Vehicle.

(emphasis supplied).  Pursuant to the Retail Installment Sale Contracts, the buyer of the automobile granted the Seller (the dealer) a security interest "in the collateral and all parts or other goods put on the collateral," as well as "all money or goods received for the collateral and all insurance premiums, service and other contracts we finance."[7]  At the end of the Retail Installment Sale Contract, above the signature of the Seller, the following language appears:  "By Signing below the Dealer/Creditor accepts this Contract and Assigns it to Inofin Incorporated in accordance with the Assignment of Seller below." Underneath the signature of the Seller, the following language appears:

> Assignment of Dealer:  For value received, Dealer hereby transfers and
> assigns to Inofin Incorporated ("Assignee") all of its rights, title and interest
> in this contract and the collateral.  This transfer and assignment is made
> pursuant to and subject to an Agreement between the Dealer and the
> Assignee by which the Assignee has agreed to accept the transfer and
> assignments of contracts from Dealer.  The Dealer understands that this
> contract is sold under the recourse provisions of the Agreement.

The Partial Purchase and Assignments were agreements between Inofin and automobile dealers, such as Stoughton Motor Mart, Inc., who was denominated "Seller," whereby the Seller assigned, transferred, set over, and conveyed to Inofin a right to receive payments of a net sum "in accordance with such obligation, repayment and terms stated

---

[7] The grant of a security interest also provided:  "The security interest secures payments of all amounts you owe in this Contract and performance of your other agreements in the Contract."

15

in the accompanying instrument, the balance of such total payment amount(s) shall be paid to Seller."[8]   The agreements essentially set forth the respective amounts to be paid to the dealers and Inofin.  Inofin did not send originals of the Partial Purchase and Assignment agreements to RCG as part of the investor packages.  Once the packages were finalized, they were put together and typically sent by Inofin to RCG by Federal Express on Friday.

The Retail Installment Sale Contracts, the originals of which were attached to the Allonge and forwarded to RCG, did not necessarily postdate the date of the weekly advance by RCG.  The investor packages that were assigned to RCG, according to Brown, "could have been funded two days ago, two weeks ago, two months ago, or two years ago."  In other words, Retail Installment Sale Contracts were not necessarily purchased with "proceeds of loans from Secured Party" pursuant to the terms of the 1996 Security Agreement, and they were not delivered "prior to or simultaneously with each advance" as required by the 2008 and 2009 Loan Agreements.

Michael Ayre, the former Director of Account Services at Inofin, based upon information which he extracted from a computer program known as East Point, produced a spreadsheet which revealed that from July 14, 2010 through December 24, 2010, which was the last day that an Allonge package was delivered to RCG, the aggregate principal

---

[8]For example, in Exhibit 3, comprising a representative Allonge package, the Retail Installment Sale contract provided for a total sale price of $17,943.20 payable by the consumer through 182 weekly payments of $87.60.  Through the Partial Purchase and Assignment which referenced a Vehicle Identification Number, Inofin purchased the right to the net sum of $14,016.00.  The parties contemplated that the vehicle would be registered in the consumer's name and that Inofin would be listed as the lienholder on the Certificate of Title.

16

balance of the Retail Installment Sale Contracts that Inofin delivered to RCG equaled $4,937,111.34.  Between October 1, 2010 and December 24, 2010, the aggregate principal balance was $2,965,952.04; during the 90-days preceding the bankruptcy, the sum was $2,312,869.24.

The Foreclosure Sales

As noted above, RCG learned from Kevin Mann, the Chief Executive Officer of the Debtor, that the SEC was investigating Inofin.  Raymond C. Green wrote to RCG's attorney on July 20, 2010 in advance of a meeting, stating, among other things, that Inofin was and had always been thinly capitalized, that he had an excellent relationship with Inofin's principals, that his goal was to "either have an independent company service  my loans (there are probably 2,000 of them) or to set aside my monies internally," and that the purpose of the meeting with his counsel was "to get myself in the best possible position in the case of a filing."  To that end, RCG, without issuing a notice of default to Inofin, initiated the foreclosure of its collateral.  Its in-house counsel, Joan C. Green, Esq., the spouse of Raymond C. Green, prepared a foreclosure notice dated January 5, 2011, although in an email to RCG's attorney she candidly stated:  "Here's a draft. Help! I have no idea what I am doing."  The foreclosure notice, dated January 5, 2011, contained a scrivener's error.  It provided that the foreclosure sale was to take place on Tuesday, January 20, 2011, although January 20, 2011 was a Thursday.  The foreclosure notice, with the scrivener's error, was sent on January 6, 2011 to the Debtor and other individuals and entities who had filed UCC financing statements provided to Joan C. Green by outside

17

counsel to RCG. Although Raymond C. Green contacted the auctioneer in an attempt to have the ad for the January 18, 2011 sale canceled, RCG's auctioneer, Dean Associates Inc., caused to be published in the *Boston Herald* on January 7, 2011 a notice of a foreclosure sale of 1,971 automobile installment sale contracts for Tuesday, January 18, 2011 at the offices of RCG.

After discovering the error in the first notice mailed to the Debtor and the UCC filers, RCG, on January 13, 2011, sent a "Corrected Notice of Sale of Collateral Under Section 9-601 of the Massachusetts Uniform Commercial Code," dated January 5, 2011, to Inofin. No other secured creditors were served with copies of the corrected notice.

RCG, through its auctioneer, conducted a foreclosure sale on Tuesday, January 18, 2011. Despite being contacted by at least one confused creditor, Richard Sgarzi, no one appeared to bid on the collateral on January 18, 2011. Raymond C. Green responded to Richard Sgarzi, but did not indicate to him that a sale was scheduled to take place on January 18, 2011. After consultation with counsel, RCG, through its general counsel, again noticed out the sale of the retail installment contracts, this time for January 26, 2011. On January 14, 2011, a notice of the sale of the same collateral was sent to all UCC filers. The auctioneer caused notice of the January 26, 2011 sale to be placed in the *Boston Herald* on January 16, 2011, two days before the January 18, 2011 foreclosure notice. Again, no interested parties appeared at the offices of RCG for purposes of bidding on January 26, 2011.

RCG bid $4 million to acquire the retail installment sale contracts based on Raymond

C. Green's "gut" assessment that the value of the portfolio was approximately 50 cents on the dollar.  RCG's auctioneer executed a  Memorandum of Sale for each auction, although both were dated February 8, 2011.  Each recited the date the notice was published in the *Boston Herald* and each provided the following:

> There were no bidders present other than representatives of Raymond C. Green, Inc.  After reading the Notice of Sale of Collateral aloud, I then began the auction sale.  Raymond C. Green, Inc. bid $4,000,000.00 for the collateral package, which was the highest bid received.

The Memoranda were signed by Stephen Dean,  President of Dean and Associates, Inc.  No bill of sale was prepared or executed conveying the collateral.   The only testimony concerning the value of the  collateral, aside from that of Raymond C. Green, was that of Craig Jalbert.  He testified that the value of RCG's collateral was $10,196,218.23.

The auctioneer received $500 for conducting each sale, and the advertisements in the *Boston Herald* cost $400 each.  Thus, RCG incurred total costs of $1,800 in scheduling and conducting foreclosure sales of RCG's purported collateral which Raymond C. Green valued at $4 million.  Dean and Associates, Inc. did no advertising other than the two ads in the *Boston Herald*.  Neither the auctioneer nor RCG engaged in any marketing efforts to identify and notify the Debtor's competitors or other persons or entities in the business of buying retail installment sale contracts; no display ads were placed in newspapers of general circulation, other than the *Boston Herald*, or trade journals.

## III. DISCUSSION

### A. Positions of the Parties

19

The most critical issue in this case is whether the Allonges independently gave RCG a security interest in the portfolio of Retail Installment Sale Contracts between consumers and automobile dealers, which were assigned to Inofin and to which RCG was not a party. RCG maintains that the Allonges do just that, while the Trustee maintains that RCG's security interest extends only to Retail Installment Sale Contracts and other collateral purchased with the proceeds of the loans from RCG and assigned and delivered to RCG pursuant to the April 17, 1996 Security Agreement. The Trustee emphasizes that RCG's weekly loan advances did not fund the purchase of the corresponding weekly Retail Installment Sale Contracts received in the weekly Allonge packages from Inofin, resulting in the absence of an enforceable security interest and that the assignments contained in the Allonges did not expand the scope of the security interest granted to RCG under the 1996 Security Agreement.

Specifically, RCG maintains that each Allonge alone was sufficient to create a valid security interest in the Retail Installment Sale Contract identified in the document. It asserts that there is no dispute that RCG extended value and that it had rights in the collateral. With respect to the third requirement of  Section 9-203(b)(3) of the Uniform Commercial Code (the "UCC") (namely that one of four conditions be met, *see* note 10, *infra)*, it maintains that the Allonges constitute security agreements as they are writings which adequately describe the collateral, are signed by Inofin, and establish the parties' intention to create a security interest. *See* Mass. Gen. Laws ch. 106, § 9-203; <u>Front Row Seating, Inc. v. New England Concerts, Ltd.</u>, 33 Mass. App. Ct. 945, 946 (Mass. App. Ct.

1992).[9]

The Trustee argues that RCG's April 17, 1996 Security Interest did not attach to the Retail Installment Sale Contracts because 1) weekly loan advances did not fund the purchase of Retail Installment Sale Contracts as the Allonges were transferred to RCG in packages that contained contracts that may have been funded two days, two weeks, two months or two years prior to the loan advance; 2) Inofin did not, and could not, trace the use of loan proceeds from RCG to its acquisition of Retail Installment Sale Contracts; and 3) Inofin purchased Retail Installment Sale Contracts prior to receipt of RCG's weekly advances and continued to deliver them to RCG after it made its last weekly loan advance. In addition, the Trustee asserts that the assignments contained in the Allonges delivered to RCG did not expand the scope of the security interest granted in the April 17, 1996 Security Agreement. According to the Trustee, the Allonge assignments 1) do not change

---

[9] In <u>Front Row Seating</u>, the court observed:

"A security agreement is required in order to create a valid security interest. . . . Of course, the intent of the parties to form a security interest is crucial." Stickells, Manual on Commercial Code § 9.54 (2d ed. 1989). *See* G.L. c. 106, § 9-102(1)( a ) (Uniform Commercial Code "applies . . . to any transaction [regardless of its form] which is intended to create a security interest . . ."). Therefore, whether a transaction created a security interest depends upon the intent of the parties and such intent is a question of fact and not matter of law, *see* Granite <u>Equip. Leasing Corp. v. Acme Pump Co.</u>, 165 Conn. 364, 368, 335 A.2d 294 (1973), or in some instances is a mixed question of law and fact, *see* <u>In re Nav. Technology Corp.</u>, 880 F.2d 1491, 1493 (1st Cir. 1989) (whether assignment of royalties created security interest depended upon intent and was mixed question of law and fact).

33 Mass. App. Ct. at 946.

the terms of the Security Agreement because it is a fully integrated agreement signed by the parties that expressly provided for the assignment and delivery of the Retail Installment Sale Contracts; 2) the parole evidence rule bars the use of "prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing," Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (Mass. App. Ct. 1997); 3) the parties' course of dealing relative to the Allonge assignments did not change the extent of the security interest granted to RCG under the Security Agreement; and 4) even assuming that the Allonge assignments are independent grants of security, RCG failed to perfect a security interest in the underlying chattel paper, because it obtained only copies of the Partial Purchase and Assignments, although it did obtain original Retail Installment Sale Contracts. The Trustee distinguished the cases cited by RCG in which he argued that the Allonge assignments expanded the scope of the Security Agreement because none of the cases cited by RCG involved an existing unambiguous and fully integrated security agreement.

With respect to his argument that RCG failed to perfect its security interest in the underlying chattel paper, the Trustee maintains that RCG cannot rely on its Financing Statement as a means of perfecting its purported security interest in chattel paper and instruments because the Financing Statement is limited to the chattel paper and instruments purchased with the proceeds of RCG's loans. Additionally, the Trustee notes that, if the underlying chattel paper includes a series of instruments, the group of records taken together constitutes chattel paper. Because the Partial Purchase and Assignment

constituted part of the chattel paper associated with the underlying consumer transaction,

as well as a document pursuant to which Inofin acquired title to the payment stream under

the Retail Installment Sale Contract, the Trustee maintains that, without possession of the

original Partial Purchase and Assignment, RCG did not perfect its security interest in any

of the original Retail Installment Sale Contracts it received in connection with the Allonge

Assignments through possession.

B. Applicable Law

In the 1996 Security Agreement the parties expressly agreed that it, and all rights

and obligations pertinent to it, would be governed by Massachusetts law.  As this Court

recognized in Levitz v. Arons Arcadia Ins. Agency, Inc. (In re Levitz Ins. Agency, Inc.), 152

B.R. 693, 697 (Bankr. D. Mass. 1992), the nature, extent and validity of an interest in the

debtor's assets must be determined in accordance with state law.  152 B.R. at 697 (citing

Butner v. United States, 440 U.S. 48 (1979)).  Accordingly, Massachusetts law, and in

particular its version of the UCC, governs the interpretation of the Security Agreement and

the related loan agreements and informs the Court's decision as to the validity and extent

of RCG's claimed security interest in the Debtor's chattel paper and other assets.

Section 9-203 of the Uniform Commercial Code[10] contains the method for

---

[10] Section 9-203 of the Uniform Commercial Code, as enacted in Massachusetts, provides in relevant part the following:

(a) Attachment. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

determining whether a security interest has attached. *See* 25A Herbert Lemelman, Manual on Uniform Commercial Code, Mass. Practice Series, § 9:53 (3d ed. 2011).[11] The Massachusetts version of the Uniform Commercial Code provides that, for a security

> (b) Enforceability. Except as otherwise provided in subsections (c) to (i), inclusive, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
>> (1) value has been given;
>> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
>> (3) one of the following conditions is met:
>>
>>> (A) the debtor has authenticated a security agreement that provides a description of the collateral  . . .;
>>> (B) the collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement;
>>> (C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301 pursuant to the debtor's security agreement; or
>>> (D) the collateral is deposit accounts, electronic chattel paper, investment property, or letter-of-credit rights, and the secured party has control under Section 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement.

Mass. Gen. Laws ch. 106, 9-203(a) and (b).

---

[11] *See* Mass. Gen. Laws ch. 106, § 9-702(a)("Except as otherwise provided in this part, this act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect."). *See also* Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC, 369 F.3d 603, 612 (1st Cir. 2004).

24

interest to attach, it must be enforceable; attachment is automatic when the security interest becomes enforceable. Id.

Section 9-203(b) sets forth the requirements for an enforceable security interest. Value must be given, the debtor must have rights in the collateral and one of four alternate conditions must be satisfied before a court can determine whether a security interest is enforceable. Two of the conditions are pertinent to the instant case, namely the existence of an authenticated, or signed, security agreement, *see* Mass. Gen. Laws ch. 106, § 9-102(a)(7)[12] and possession of the collateral pursuant to a security agreement. With respect to the 1996 Security Agreement, only the existence of one of the four conditions is at issue, as there is no dispute that value was given and Inofin had rights in the collateral.

In In re Levitz Ins. Agency, Inc., this Court considered a security agreement and whether it created an enforceable security interest. It observed:

> Under Massachusetts law, the creation of a security interest requires a security agreement that describes the collateral. M.G.L. c. 106, § 9–203(1). *A security interest attaches only to the property described in the security agreement.* In re Nightway Transp. Co., Inc., 96 B.R. 854 (Bankr. N.D. Ill. 1989). There is no requirement that the agreement be entitled security agreement to be

---

[12] The UCC contains a definition of "authenticate":

"Authenticate" means:

> (A) to sign; or
> (B) to execute or otherwise adopt a symbol, or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record . . . .

Mass. Gen. Laws ch. 106, § 9-102(a)(7).

enforceable as long as it evidences an intent to create a security interest. In re Sportsland, Inc., 17 U.C.C.Rep.Serv. 1333 (Bankr. D. Mass. 1975). Indeed, the security agreement may consist of several documents. Baystate Drywall, Inc. v. Chicopee Savings Bank, 385 Mass. 17, 429 N.E.2d 1138 (1982). The description is sufficient if it "reasonably identifies what is described." M.G.L. c. 106, § 9–110.

152 B.R. at 697 (emphasis supplied).   See also Jojo's 10 Restaurant, LLC v. Devin Props.,

LLC  (In re JoJo's 10 Restaurant, LLC), LLC, __ B.R. __, 2011 WL 1984529 (Bankr. D. Mass.

May 20, 2011).  In In re JoJo's 10 Restaurant, LLC, the court stated:

> The UCC governs the creation of security interests. To be effective, a security interest must have attached to the collateral in question. UCC § 9–308(a). Unless an agreement between the parties provides otherwise, a security interest attaches to collateral only when it becomes enforceable against a debtor with respect to the collateral. § 9–203(a). A security interest in a debtor's assets becomes enforceable when (i) value has been given, (ii) the debtor has rights in the collateral or the power to transfer the rights and (iii) the debtor has authenticated a security agreement that provides a description of the collateral. § 9–203(b). In order for a security interest to have priority over subsequent secured creditors, it must be perfected. § 9–317(a). An attached security interest is perfected upon the filing of a financing statement in the appropriate centralized registry. §§ 9–308(a) and 9–310(a).

Id. at * 3 (footnote omitted).[13]

The Massachusetts Supreme Judicial Court in Baystate Drywall, Inc. v. Chicopee

Savings Bank, 385 Mass. 17 (1982), citing, among other cases, In re Numeric Corp., 485 F.2d

1328, 1331-32 (1st Cir. 1973), observed: "A debtor need not . . . sign a document designated

_____

[13] Section 9-308 provides in pertinent part: " Except as otherwise provided in this section and Section 9-309, a security interest is perfected if it has attached and all of the applicable requirements for perfection in Sections 9-310 to 9-316, inclusive, have been satisfied. A security interest is perfected when it attaches if the applicable requirements are satisfied before the security interest attaches."  Mass. Gen. Laws ch. 106, § 9-308(a).

'security agreement' in order to satisfy the code requirement that the debtor sign a security

agreement.  A combination of documents may meet that requirement."[14] 385 Mass. at 22.

*See also* In re Jojo's 10 Restaurant, LLC, 2011 WL 1984529 at *4 ("the  security agreement

may consist of several different documents that 'collectively establish an intention to grant

a security interest' in the collateral identified in the documents.").  According to the court

in Jojo's Restaurant, "[i]f one such document lists the collateral to be secured, it must

contain some granting language expressing the debtor's intent to create a security interest."

2011 WL 1984529 at *4 (citing  In re Rowe, 369 B.R. 73, 76–77 (Bankr. D. Mass. 2007)).

　As an alternative to an authenticated security agreement, if value has been given

and the debtor has rights in the collateral, a security interest may be enforceable under

UCC § 9-203(b) if the collateral is in the possession of the secured party pursuant to a

security agreement under Section 9-313 of the UCC.  According to a Massachusetts

---

[14] The court relied upon the following cases in addition to Numeric in which the court found that a financing statement and a directors' resolution created a security agreement: In the Matter of Bollinger Corp., 614 F.2d 924, 926-927 (3rd Cir. 1980) (promissory note, financing statement, and correspondence); In the Matter of Carmichael Enterprises, Inc., 334 F.Supp. 94, 104-105 (N.D. Ga. 1971), *aff'd per curiam*, 460 F.2d 1405 (5th Cir. 1972) (financing statement and a letter on which the debtor wrote "agreed"); In the Matter of Fibre Glass Boat Corp., 324 F.Supp. 1054, 1055-1056 (S.D. Fla. 1971) (financing statement and letter); In re Center Auto Parts, 6 U.C.C. Reporting Serv. 398, 399 (C.D. Cal. 1968) (promissory note and financing statement); Komas v. Future Sys., Inc., 71 Cal.App.3d 809, 814, 139 Cal.Rptr. 669 (Cal. App. 1977) ("A writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it"); Casco Bank & Trust Co. v. Cloutier, 398 A.2d 1224, 1229-1231 (Me.1979) (promissory note and financing statement).

commentator,

> [U]nder § 9-203(b)(3)(B), with the exception of certain types of collateral, if the secured party receives possession of the collateral, under § 9-313 (dealing with possession for perfection . . .), no authenticated agreement is necessary for the purpose of attachment. That is not to say that an authenticated security agreement may not be preferable, since such agreement would normally contain other important provisions of agreement between the parties.

25A Herbert Lemelman, Manual on Uniform Commercial Code, Mass. Practice Series, §9:53

(3d ed. 2011).  Section 9-313 provides:  "Except as otherwise provided in subsection (b), a

secured party may perfect a security interest in negotiable documents, goods, instruments,

money, or tangible chattel paper by taking possession of the collateral. . . ."  Mass. Gen

Laws ch. 106, § 9-313(a).  Again, according to a Massachusetts commentator,

> M.G.L.A. c. 106, § 9-313 deals with the availability of the common law pledge as a method of perfection. Under former M.G.L.A. c. 106, § 9-203, such a pledge as was available under the section did not have to be accompanied by an agreement. The language of the present provision, M.G.L.A. c. 106, § 9-203, however, makes it clear that in order for a pledge to attach and be enforceable, it must be pursuant to an agreement. . . .  M.G.L.A. c. 106, § 9-308(c) provides that if there has been a filing for perfection and thereafter perfection by taking possession (a pledge), the perfection is deemed to be continuous for the purpose of priority so long as there is no intervening period during which the security interest is unperfected. One should also be reminded of the common law principle that in the case of a pledge, the debtor or the debtors agent cannot be the one in possession of the collateral.

27B Herbert Lemelman, UCC Forms Annotated, Mass. Practice Series, §9-313 (3d ed. 2011).

Additionally, that commentator has observed:

> The difference between possessory and non-possessory security interests provides a basis for a flexible approach in finding whether a security agreement exists. It should be noted that such an agreement is required even if possession, or control, is transferred; in that, such event must be pursuant

to an agreement. What may not be necessary is an authenticated document.

25A Herbert Lemelman, Manual of Uniform Commercial Code, § 9:54 (3d ed.  2011).

"[A] security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."  Mass. Gen. Laws ch. 106, § 9-201(a). Given that precept, the Security Agreement, Loan Agreements and Loan Modification Agreement are contracts that should be interpreted as such. In Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C., 369 F.3d 603 (1st Cir. 2004), a case involving enforcement of dragnet clauses in secured commercial lending agreements and a claim for violation of the reasonable commercial standards of fair dealing included in the UCC's duty of good faith, the United States Court of Appeals for the First Circuit stated:

> The applicable law for construing the parties' agreement is the Massachusetts Commercial Code, in particular Articles One (general provisions) and Nine, *see* 1 Farnsworth, supra, § 1.9a (Article One applies whenever another Article of the code applies), as well as background Massachusetts principles of contract interpretation.
>
>  The usual rule in Massachusetts is that "where the wording of the contract is unambiguous, the contract must be enforced according to its terms." Liberty Mut. Ins. Co. v. Gibbs, 773 F.2d 15, 17 (1st Cir.1985) (internal quotation marks omitted); *see* Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 856 F.2d 361, 365 (1st Cir.1988).

Pride Hyundai, Inc., 369 F.3d at 615-16.

In this regard, the UCC provides, in pertinent part, the following:

(1) This chapter shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this chapter are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

Mass. Gen. Laws ch. 106, § 9-102.

C. Analysis

1. The 1996 Security Agreement, the Loan Agreements, and the Allonges

The Security Agreement, dated April 17, 1996,  purported to give RCG a security

interest in several types of collateral, including chattel paper[15] and instruments.[16]  The

Retail Installment Sale Contracts, identified in the Security Agreement as "motor vehicle

---

[15] The term "'Chattel paper' means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, 'monetary obligation' means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include charters or other contracts involving the use or hire of a vessel or records that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes chattel paper." Mass. Gen. Laws ch. 106, § 9-102(11).

[16]  The term "'Instrument' means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment. The term does not include (i) investment property, (ii) letters of credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card." Mass. Gen. Laws ch. 106, § 9-102(47).

installments sales contracts,"constitute chattel paper as they evidence both a monetary

obligation and a security interest in specific goods.   *See* Mass. Gen. Laws ch. 106, § 9-

102(11); <u>Gen. Motors Acceptance Corp. v. Third Nat'l Bank in Nashville</u>, 812 S.W2d 593,

596 (Tenn. App. Ct. 1991).

The Security Agreement was limited to chattel paper and instruments that were 1)

purchased with proceeds of RCG's loans; and 2) assigned and delivered to RCG.   If this

Court were to conclude that the Security Agreement is not an integrated document and that

the Allonges are sufficient, in and of themselves, to constitute security agreements, then

RCG obtained a security interest, perfected by possession, in the Retail Installment Sale

Contracts it obtained from Inofin regardless of whether they were purchased with proceeds

of its loans.  Alternatively, if this Court were to find that the language used in the Security

Agreement is either patently or latently ambiguous, the Court could consider extrinsic

evidence as to the parties' intent.  In <u>Coffin v. Bowater Inc.</u>, 501 F.3d 80 (1st Cir. 2007), the

United States Court of Appeals for the First Circuit observed:

> We have stated that "[a]n unambiguous contract must be enforced according
> to its terms, under both the common law and labor law." <u>Senior v. NSTAR
> Elec. & Gas Corp.</u>, 449 F.3d 206, 219 (1st Cir.2006). However, in the
> exceptional case, a latent ambiguity in seemingly clear contract language
> may require us to consider extrinsic evidence to determine the actual object
> of the parties' agreement. *See* <u>RCI Ne. Servs. Div. v. Boston Edison Co.</u>, 822
> F.2d 199, 202 (1st Cir.1987). "An ambiguity is latent when the language
> employed is clear and intelligible and suggests but a single meaning, but
> some extrinsic fact or extraneous evidence creates a necessity for
> interpretation or a choice among two or more possible meanings." <u>Moore v.
> Pa. Castle Energy Corp.</u>, 89 F.3d 791, 796 (11th Cir.1996). For example, a
> contract may refer to an object by a name that denotes more than one actual
> thing or the parties may use a term that, while signifying one thing in

common parlance, designates something particular within the industry's jargon. *See* AM Int'l, Inc. v. Graphic Mgmt. Assocs., 44 F.3d 572, 575 (7th Cir.1995) (giving examples of both scenarios). The classic case of latent ambiguity is Raffles v. Wichelhaus, 2 Hurlstone & Coltman 906, 159 Eng. Rep. 375 (Ex. 1864), in which a contract respecting a shipment of cotton to arrive from a certain port on the ship "Peerless" was found ambiguous when the parties discovered that two ships named "Peerless" had departed from the same port. . . .

Mindful that a court may not deprive the contracting parties of the protection they sought when they embodied their agreement in writing, courts have generally allowed only "objective" evidence to establish such a latent ambiguity. That includes "evidence of ambiguity that can be supplied by disinterested third parties," AM Int'l, 44 F.3d at 575, and evidence that is uncontested between the parties, Rossetto v. Pabst Brewing Co., 217 F.3d 539, 546 (7th Cir.2000); it excludes "the self-serving testimony of one party to the contract as to what the contract . . . 'really' means," id.

Coffin v. Bowater Inc., 501 F.3d at 97-98.

As will be discussed in more detail below, the Court finds that the 1996 Security Agreement was at least partially integrated. Although the agreement did not contain an integration clause, the Financing Statement, in which the parties employed the same language used in the Security Agreement, provides strong evidence that the Security Agreement was the complete and exclusive agreement between them as to the scope of RCG's security interest until such time as the parties executed the Loan Agreements and later the Loan Modification Agreement. Notably, those agreements contained language which again circumscribed the scope of RCG's security interest to Retail Installment Sale Contracts acquired with the proceeds of RCG's loans. *See* RGJ Assocs., Inc. v. Stainsafe, Inc., 338 F.Supp.2d 215, 244 (D. Mass. 2004) (discussed *infra*).

Neither RCG nor the Trustee argue that the 1996 Security Agreement is ambiguous.

32

Instead, RCG relies on the Allonges with their assignments "with full recourse, to Raymond C. Green Inc. of all its right, title and interest in, to and under" the Retail Installment Sale Contracts, asserting that "a pledge of collateral through an assignment, signed by the Debtor is sufficient to create a security agreement." In other words, it relies on the Allonges, not the 1996 Security Agreement, to establish its security interest in the Retail Installment Sale Contracts, although it also argues that the Loan Modification Agreement expanded the scope of the 1996 Security Agreement, even though it did not expressly amend the Security Agreement.[17] In essence, RCG asks this Court to ignore unambiguous language of the 1996 Security Agreement, even though that agreement was referenced by the parties in loan documents continuously during their course of dealing.

RCG cites, *inter alia*, Dahar v. Raytheon Co. (In re Navigation Tech. Corp.), 880 F.2d 1491, 1493 (1st Cir. 1989), in support of its position. In that case, the United States Court of Appeals for the First Circuit construed the following language relating to an ambiguous agreement as supporting a determination that an assignment constituted a security agreement:

> To secure the payment of Bank debt, the Assignor [Navtec] hereby assigns and transfers to the Bank all accounts and Contract Rights arising under the Contracts [the License Agreement] [and] the proceeds thereof . . .; but no security interest in goods in favor of the Bank shall arise hereunder in any case where such interest would conflict with any title to or lien upon the goods in favor of the United States of America. . . .

---

[17] Section 9-313 provides: "Except as otherwise provided in subsection (b), a secured party may perfect a security interest in negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral. . . ." Mass. Gen Laws ch. 106, § 9-313(a).

33

880 F.2d at 1493.[18]  Based upon that language, the First Circuit concluded:

> The assignment itself indicates that it serves "To secure the payment of Bank debt," and this is generally seen as sufficient to establish a security agreement. White & Summers at 301 ("Even unorthodox documents containing words such as . . . 'to secure,' 'security,' [or] assignment language . . . are likely to be upheld as adequate security agreements, even when not explicitly labeled as such."). The assignment's function as a security is further supported by testimony by Navtec's former president, Jeffery W. Perkins, that it was undertaken as part of an ongoing financial relationship with the bank, that it served to secure a Small Business Administration loan acquired through the bank, and that receipts under the assignment were credited to Navtec's account. The "absolute" nature of an assignment does not preclude its service as a security agreement. Since the assignment is a legally sufficient writing, and since the bankruptcy court's finding that the assignment was in fact intended as a security agreement is not clearly erroneous, we do not disturb the court's determination that the assignment was as a security.

Id. (citations omitted).

An assignment of an asset as payment, and the pledging or offer of security to be held until a loan is paid are not the same, however, and they have different legal consequences.  An assignment transfers title to the asset to the assignee, who has the immediate right, upon the signing of the agreement, to pursue payment of the loan from the assigned asset.  A pledged asset, on the other hand, requires the creditor to wait until the debtor defaults on the loan before the asset may be used for payment. See generally 6 Am. Jur. 2d Assignments § 110 (2011).  The intention of the parties is crucial to a determination of whether a transaction creates a security interest and such intent is a

---

[18] In contrast, the Allonge provided:  "In consideration of One Dollar . . . and other valuable consideration . . . Inofin, Inc. hereby assigns, with full recourse, to Raymond C. Green Inc., all its right, title and interest in, to and under the following instruments . . . ."  As noted above, the retail installment contracts have been held to be chattel paper, not an instruments.

34

question of fact and not a matter of law, or in some instances a mixed question of fact and

law. Front Row Seating, Inc. v. New England Concerts, Ltd., 33 Mass. App. Ct. 945, 602

N.E.2d 1103,1105 (Mass. App. Ct. 1992).

RCG maintains that the Allonges adequately described the collateral, namely

individual Retail Installment Sale Contracts, that RCG gave value for the contracts in the

form of weekly loans to the Debtor, that the Debtor had rights in the contracts and the

power to transfer those rights, which it did on a weekly basis, and that the Debtor, through

a corporate officer, signed the Allonge. *See* Mass. Gen. Laws ch. 106, § 9-203(b). Moreover,

according to RCG, the parties' intent was clear.

The Trustee asserts that the Allonges do not create an independent security

agreement because the 1996 Security Agreement expressly provided for the assignment

and delivery of "chattel paper, instruments and all motor vehicle installments sales

contracts." Additionally, the $7 million note and the $ 8 million dollar note both reference

the 1996 Security Agreement, which was never modified or amended. Moreover, the Loan

Agreements reference the Allonges as one of several "Security Documents" which were

required to be delivered to RCG "prior to or simultaneously with each advance."[19] Indeed,

the Security Documents were defined to include 1) the 1996 Security Agreement, 2) the

UCC-1 Financing Statement, 3) the original Retail Installment Sale Contracts, 4) Inofin's

---

[19] The language used by the parties is puzzling in that it is hard to fathom why
Inofin would deliver Retail Installment Sale Contract to RCG prior to each advance.
Moreover, according to the testimony of Adams and Brown, Inofin did not
simultaneously deliver contracts to RCG when it made its weekly advance.

original Partial Purchase and Assignments, 5) the Application for Title, and 6) the Allonge. In his view, the 1996 Security Agreement was the only security agreement between the parties. He adds that "it is clear that the Debtor's delivery of *weekly* assignments to RCG was in connection with, and consistent with, RCG's security interest under the Security Agreement" and that RCG's argument that the Allonge assignments, either standing alone or read together with the Security Agreement and Loan Agreements, expanded the scope of RCG's security interest to cover Retail Installment Sale Contracts not purchased with the proceeds of RCG loans to the Debtor should be rejected.

The Trustee's argument is premised on the 1996 Security Agreement being a fully integrated contract. In Ferrari v. Family Mutual Savs. Bank (In re New Era Packaging, Inc.), 186 B.R. 329 (Bankr. D. Mass. 1995), *abrogated on other grounds,* In re Merrimac Paper Co., Inc., 420 F.3d 53 (1st Cir. 2005), the court examined the law associated with the determination of whether a contractual agreement is fully integrated. It stated:

> Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence. Restatement (Second) of Contracts § 209 cmt. c. (1979). *See* Rokowsky v. Gordon, 501 F.Supp. 1114, 1121 (D. Mass. 1980); Caputo v. Continental Construction Corp., 340 Mass. 15, 18, 162 N.E.2d 813, 816 (1959). However, the determination of whether an agreement is integrated is determined by the court as a question preliminary to an interpretative ruling or to the application of the parole evidence rule. Restatement (Second) of Contracts § 209.

Id. at 333-34. The court added:

> The propriety of considering extrinsic facts to show terms of a contract other than those which have been reduced to writing depends on whether the writing was intended by the parties to embody the entire transaction, so as

to constitute the sole evidence of their agreement. 17A Am.Jur.2d Contracts § 398 (1991). If the parties evidence an intention in the written contract itself that the agreement should be treated as fully integrated, extrinsic evidence may not be considered. Id.

Massachusetts law provides:

> [w]here the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending to be a complete and final statement of the whole transaction.'

Bendetson v. Hamilton Coolidge, 7 Mass.App.Ct. 798, 802–03, 390 N.E.2d 1124, 1127 (1979), citing, Glackin v. Bennett, 226 Mass. 316, 319–320, 115 N.E. 490, 491 (1917). See Robert Industries, Inc. v. Spence, 362 Mass. 751, 754, 291 N.E.2d 407, 409 (1973); Gifford v. Gifford, 354 Mass. 247, 249, 236 N.E.2d 892, 893 (1968); Berman v. Geller, 325 Mass. 377, 379–80, 90 N.E.2d 843, 845 (1950). The presumption of integration, however, does not apply where the writing is manifestly fragmentary or is intended to be only a partial integration or is ambiguous. 17A Am.Jur.2d Contracts § 398. . . .

New Era Packaging, Inc., 186 B.R. at 334.  In Cabot v. Cabot, 55  Mass. App. Ct. 756, 774

N.E.2d 1113 (Mass. App. Ct. 2002), the court stated:

> "A fully integrated agreement is a statement which the parties have adopted as a complete and exclusive expression of their agreement." Starr v. Fordham, 420 Mass. at 188 n. 8, 648 N.E.2d 1261, citing Restatement (Second) of Contracts § 210(1) (1981). Such an agreement will typically contain an "integration clause" stating that it constitutes the parties' sole agreement and that there are no oral or written representations outside of the agreement. See, e.g., Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 496 n. 6, 678 N.E.2d 180 (1997).

Cabot, 774 N.E.2d at 1120. See also RGJ Assocs., Inc. v. Stainsafe, Inc., 338 F.Supp.2d 215 (D.

Mass. 2004).  In Stainsafe, the court observed:

> Case law and the Restatement (Second) of Contracts (1981) distinguish

37

between partially and completely integrated documents in applying the parol evidence rule. An agreement may be partially integrated in the sense that it expresses the parties' final agreement or fully integrated in the sense that it expresses the parties' exclusive and complete agreement. *See* Restatement (Second) of Contracts § 213(1) & § 213(2) (1981); <u>Coll v. PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995) (noting that parol evidence rule only applies where parties created " partially or completely integrated document" and citing section 213 of Restatement (Second) of Contracts (1981); emphasis added); 35 Massachusetts Practice § 1.26 (2001) (partially integrated contract may be supplemented with consistent additional terms but may not be contradicted whereas completely integrated agreement cannot be supplemented or contradicted by prior or contemporaneous agreements).

338 F.Supp.2d at 224 n.56.[20]

The Security Agreement executed by the parties in 1996, unlike the two Loan Agreements executed on May 2, 2008 and August 21, 2009, does not contain an integration clause. Nevertheless, it is a four-page, single spaced document drafted by an attorney engaged by RCG, Stanley Wallerstein, Esq. Because of the absence of an integration clause, however, the presumption that it is the full and final agreement does not exist, although, notably, it was never expressly modified or amended during the 15-year lending relationship between RCG and Inofin during which three additional promissory notes, two Loan Agreements, and a Loan Modification Agreement were drafted and executed. *See*

--------

[20] In <u>Stainsafe</u>, the court added that "Section 2-202 of the UCC draws this distinction by providing that final expressions of the parties' agreement, i.e., partially integrated contracts, may not be contradicted but may be explained or supplemented by the parties' course of dealing, course of performance or usage of trade. Mass. Gen. L. ch. 106, § 2-202(a). Where the writing is a complete and exclusive statement of the parties' agreement, i.e., a completely integrated contract, section 2-202 prohibits even the introduction of consistent additional terms. Mass. Gen. L. ch. 106, § 2-202(b)." <u>Id.</u>

LaChance v. Baybank Norfolk, No. 92-1088, 1994 WL 878761 at *13 (Mass. Super. Nov. 2, 1994) ("Under the parol evidence rule, prior oral expressions of an agreement are inadmissible to vary the terms of a written agreement intended to embody the full and final expression of the parties' bargain . . . [and] . . . Where . . . an integration clause exists in the written agreement, a presumption exists that the written document constitutes a final and full expression of the parties' agreement.").

In R&R Chemicals, LLC v, Cellect, LLC, 2002 WL 2018725 (D. Mass. Aug. 29, 2002), the court observed that "[t]he parole evidence rule 'bars the introduction of *prior or contemporaneous* written or oral arguments that contradict, vary or broaden an integrated writing.'" 2002 WL 2018725 at *4 (emphasis supplied) . The court added that "[t]he rule that when parties have reduced their contract to writing, previous or contemporaneous oral or written agreements are merged, does not apply to collateral or independent agreements." Id. (citing Tomkins v. Sullivan, 313 Mass. 459, 461, 48 N.E.2d 15, 16 (1943)). Additionally, a written agreement, such as the 1996 Security Agreement, is not superseded or invalidated by a subsequent integration relating to the same subject matter, if the agreement is not inconsistent with the integrated contract, made for separate consideration or if the agreement might naturally have been made as a separate agreement. Id. (citing Restatement (Second) of Contracts, § 240 (1979) and Manganaro v. DeSanctis, 351 Mass. 107, 110, 217 N.E.2d 760, 763 (1966)).

The 1996 Security Agreement, as a partially integrated agreement, cannot be contradicted by the parties' course of dealing. There can be no doubt that the parties

contemplated that RCG was to obtain a security interest in chattel paper, instruments and the Retail Installment Sale Contracts based upon the Loan Documents, defined in the Loan Agreements. Nevertheless, in drafting the Security Agreement and Loan Agreements, the parties circumscribed RCG's rights in and to instruments and chattel paper by limiting its security interest to collateral purchased with the proceeds of RCG's loans, which were not placed in a segregated account and cannot, therefore, be traced. The question of whether the Allonges have the effect of overriding the limitation set forth in both the Security Agreement and the Loan Agreements, at least with respect to the Retail Installment Sale Contracts which were assigned to and possessed by RCG, poses significant legal and factual challenges. Both the Trustee and RCG make compelling arguments in support of their respective positions, and case law exists which supports both sides. Resolution of the issue is by no means crystal clear as the Loan Agreements executed in conjunction with the $7 million and $8 million notes could be interpreted liberally to permit the Allonge assignments to serve as independent security agreements. Alternatively the Allonges can be viewed as serving merely as a type of cover sheet pursuant to which the Retail Installment Sale Contracts and Partial Purchase and Assignments were to be delivered to RCG pursuant to the 1996 Security Agreement and the 2008 and 2009 Loan Agreements. Indeed, this is the more likely scenario as some sort of tracing measure was necessary in the absence of segregated accounts.

The Court concludes that, at the time each Allonge was executed, the parties did not intend that each Allonge would constitute a separate security agreement. In both the

Security Agreement and the Loan Agreements dated May 2, 2008 and August 21, 2009, the parties *expressly* contemplated that the chattel paper associated with the 1996 Security Agreement would be delivered *prior to or simultaneously with each advance* made by RCG. Thus, the 2008 and 2009 Loan Agreements restated and reinforced the extent of RCG's security interest, tying it to "the proceeds of loans" or "each advance." In the absence of any segregated account for the proceeds of RCG loans, the Retail Installment Sale Contracts cannot be tied to any particular advance.

The conclusion that the parties did not intend the Allonges to be independent security agreements is reinforced by the terms of the Loan Agreements. The Allonges were defined in the Loan Agreements as one of eight (8) Loan Documents and one of six (6) Security Documents, which included the Security Agreement and the UCC-1 Financing Statement.[21] The parties did not express an intention that the Allonge assignments would have independent significance as security agreements. If the parties had intended, at the time, for each Allonge to constitute a separate and independent security agreement, they undoubtedly could have and would have said so in the Security Agreement or in their Loan Agreements or in the promissory notes. The parties did not do so. Indeed, the Security Documents identified in paragraph 2(e) of the Loan Agreements listed the documents, including the Allonges, which were to be delivered "prior to or simultaneously

---

[21] An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself. Such must be so firmly affixed thereto as to become a part thereof." Black's Law Dictionary 70 (5th ed. 1979) (citing U.C.C. § 3-202(2)).

41

with each advance." Thus, the Court finds that the Trustee has the better of the arguments and that the Retail Installment Sale Contracts were delivered to RCG pursuant to the 1996 Security Agreement and the security interest in the chattel paper and instrument, including the Retail Installment Sale Contracts, is limited and enforceable only pursuant to the terms of that contract. RCG simply did not enforce its right under the Security Agreement "to arrange for verification of accounts, under reasonable procedures, directly with account debtors or by other methods."

RCG did not obtain possession of original copies of the Partial Purchase and Assignments, despite the requirement set forth in the Loan Agreements, as Inofin only included copies of those documents in the Allonge packages delivered to RCG. Additionally, RCG was not listed on the Certificates of Title and did not obtain the original titles.

The Trustee also maintains that, without original Partial Purchase and Assignments, the documents by which RCG acquired title to the payment streams under the Retail Installment Sale Contracts were not perfected and, accordingly, RCG had no rights to the Installment Contracts. Because the Loan Agreements provided that "Lender agrees that if and to the extent that there is a difference between the Borrower's rights under any 'Partial Purchase and Assignment' and any 'Recourse Assignment' [the Allonge], the former shall control," the Court finds that the Trustee could prevail with respect to his argument that the Allonge assignments did not create independent security agreements that trump the 1996 Security Agreement. *See* Glosser v. Colonial Pacific Leasing Co. (In re

42

Equitable Fin. Mgmt., Inc.), 164 B.R. 53 (Bankr. W.D. Pa. 1994). Because the Court has

determined that the Allonges are not separate security agreements, however, the Court

need not reach this issue.

2. The Loan Modification Agreement

RCG argues that, even if the 1996 Security Agreement is given a narrow

interpretation, the Loan Modification Agreement expanded the scope of the security

interest because the parties modified their prior agreement through the subsequent writing

in which they stated:

> As security for the Loan Facility, on or after the date hereof, Borrower shall
> assign and deliver to Lender, pursuant to Section 2(e) of the Loan
> Agreement, Installment Contracts having an outstanding balance of equal to
> the greater of (i) $10,000,000.00 or (ii) 125% of the outstanding principal
> balance due to Lender under the Loan Facility (both Notes). With each
> weekly interest payment, Borrower shall certify to Lender the total
> outstanding principal balance of the pledged Installment Contracts and shall
> assign and pledge new Installment Contracts as necessary. It shall be a
> default under the Notes and Loan Facility if, at any time, the outstanding
> balance of the pledged Installment Contracts is less than is required under
> this Section 4.

RCG relies upon, *inter alai,* Farmer v. Green Tree Serv. LLC (In re Snelson), 330 B.R. 643

(Bankr. E.D. Tenn. 2005), for the proposition that the Security Agreement was modified by

the Loan Modification Agreement and provided RCG with a security interest in the

Allonge packages as needed to maintain an aggregate face value of Retail Installment Sales

Contracts of either $10 million or 125% of the principal amount then due RCG by Inofin.

The Trustee maintains that the Loan Modification Agreement did not expand the

scope of RCG's security interest or constitute a new security agreement. In his view, it

43

merely increased the amount of collateral security that the Debtor needed to provide RCG. He relies upon the language of the Loan Modification Agreement in which the parties indicate their intention to change the Loan Facility, namely the two promissory notes and Loan Agreements, not the Security Agreement, dated April 17, 1996.

Based upon the language employed by the parties in the Loan Modification Agreement, and the provisions of Mass. Gen. Laws ch. 106, § 9-203(b), the Court concludes that RCG did not obtain a perfected security interest in the entire portfolio of Retail Installment Sale Contracts, although the parties attempted to grant RCG a security interest in collateral delivered to it after the date of the Loan Modification. The language employed in the Loan Modification Agreement amended the Security Agreement dated April 17, 1996 by deleting the requirement that Retail Installment Sale Contracts be purchased by Inofin proceeds of loans from RCG.

Turning to the enforceability of the security interest, the issue is whether RCG gave value for the Retail Installment Sales Contracts delivered to it after October 1, 2010. The Court finds that it did not. RCG ceased making weekly advances to the Debtor in July of 2010, although it made one further advance on August 9, 2010. As consideration for the Loan Modification Agreement, RCG reduced the interest rate from 13% to 8%, deferred principal payments and agreed to forebear from foreclosing. Because this Court has determined that RCG did not have a valid security interest in the Retail Installment Sale Contracts, however, that consideration would not constitute "value" for the grant of a security interest in the Loan Modification Agreement. Indeed, the Trustee argues that the

44

delivery of Allonge packages totaling $4,937,111.34 between July 16, 2010 and December

24, 2010 constituted fraudulent transfers, particularly as RCG, in its July 20, 2010 letter to

counsel recognized that Inofin was thinly capitalized and was unable to make its weekly

principal payments because the SEC had prohibited it from obtaining new loans from

"small investors."   Additionally, the Trustee has asserted that the Allonge packages

totaling $2,312,869.94 received during the 90-day period preceding the commencement of

the case constituted preferential transfers.

In view of the issue relating to the value provided by RCG, the Court finds that the

October 1, 2010 Loan Modification Agreement failed to satisfy the requirements of Mass.

Gen. Laws ch. 106, § 9-203(b)(1). *See* note 10, *supra.*

### 3. The Foreclosure Sale

The Court has determined that RCG did not have an enforceable security interest

in the portfolio of Retail Installment Sale Contracts, instruments and chattel paper.  Thus,

the foreclosure sale of RCG's purported collateral was a nullity.  Moreover, the Court

concludes that even were RCG to have a valid security interest in any of the collateral, the

sales it conducted were not commercially reasonable.

Massachusetts law provides:

> Every aspect of a disposition of collateral, including the method, manner,
> time, place, and other terms, must be commercially reasonable. If
> commercially reasonable, a secured party may dispose of collateral by public
> or private proceedings, by 1 or more contracts, as a unit or in parcels, and at
> any time and place and on any terms.

Mass. Gen. Laws ch. 106, § 9-610(b).   Moreover, "good faith" is a related concept and

45

means "honesty in fact and the observance of reasonable commercial standards of fair dealing." Mass. Gen. Laws ch. 106, § 9-102(43).

Aside from the price received at a foreclosure sale, courts consider several other factors to determine whether a transaction is commercially unreasonable. These include:

> [1] whether the timing between the sale and notice was too short or too long; [2] whether the seller advertised the sale; [3] whether the sale was in a proper place; [4] whether the seller permitted necessary inspections by prospective bidders; [5] whether the seller performed necessary repairs; and [6] whether the seller held the sale at the same time and location as advertised. . . .

Wells Fargo Business Credit v. Environamics Corp., 77 Mass. App. Ct. 812, 820 (Mass. App. Ct. 2010) (citing 4 White & Summers, Uniform Commercial Code § 34-11, 464-466 (6th ed. 2010)). The court in Environamics added: "In this regard, adjudication of the ''commercially reasonable' standard . . . produces inquiry into the competence and aggressiveness of the marketing effort." Id. (citing Pemstein v. Stimpson, 36 Mass.App.Ct. 283 (1994)).

Based upon the undisputed facts pertinent to the foreclosure sales conducted by RCG, the Court concludes that the sales were not conducted in a commercially reasonable manner. Although the Security Agreement provided that ten days notice would be sufficient and reasonable, the Trustee correctly points out that the first notice, which was sent to 29 creditors, as well as the Debtor, and its principal, contained the wrong date; the second notice was sent only to the Debtor two days before the date of sale; and the third notice provided notice of a sale to be conducted on January 26, 2011, although RCG had conducted a foreclosure sale as to the Debtor on January 18, 2011. When a creditor, Richard

46

Sgarzi, inquired about the foreclosure sale, Raymond Green failed to inform him that the sale would be held on January 18, 2011.

Joan C. Green, RCG's general counsel, lacked experience in preparing notices for the foreclosure sale of non-real estate collateral and acknowledged needing assistance in drafting the notice. Moreover, she was unaware of whether Inofin was in default at the time she prepared the Notices of Sale and did not issue or cause a notice of default to be delivered to Inofin. She failed to direct the auctioneer to contact the Debtor's competitors and extensively advertise the sale; indeed, Raymond C. Green contacted the auctioneer in an attempt to have the ad for the January 18, 2011 sale canceled. Other irregularities with respect to the sales included the absence of language of conveyance in the Memorandum of Sale and the preparation of a Bill of Sale.

The auctioneer, who was paid a flat fee of $500 for conducting both foreclosure sales, made no effort to solicit bids from individuals or entities in the industry by placing ads in trade publications. He merely placed ads in the *Boston Herald*. RCG was contacted by one confused creditor and another entity; there was insignificant interest in bidding on the loan portfolio of 1,971 Retail Installment Sale Contracts.

The Court's conclusion that the sale was commercially unreasonable is based upon the lack of competence associated with the preparation of the Notices of Sale and the lack of aggressiveness on the part of the auctioneer. The manner in which the auctioneer was compensated is compelling evidence that solicitation of competing bids was not welcome. The flat fee of $500, as opposed to a sliding scale gauged to the gross proceeds obtained at

the auction also   is compelling evidence that RCG was desirous of a perfunctory foreclosure sale.  Indeed, Raymond C. Green indicated in a letter to his attorney dated July 20, 2010 that his goal was to "either have any [sic] independent company service my loans . . . or to set  aside my monies internally."

### 4. Purchase Money Security Interest

RCG argues that it has a purchase money security interest ("PMSI")  in the RCG portfolio.  It reasons that because UCC § 9-103 provides for a PMSI "to the extent that goods are purchase-money collateral," "a PMSI can be valid to the extent of the financed goods, and, subject to this limitation, a PMSI can cover non-consumer goods as well." It relies upon the "dual status" rule set forth in UCC § 9-103(f) and cmt. 7 which permit a PMSI over mixed collateral.[22]  It argues:

---

[22] Comment 7 to UCC § 9-103(f) provides in relevant part:

 "Dual-Status" Rule. For transactions other than consumer-goods transactions, this Article approves what some cases have called the "dual-status" rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent. (Concerning consumer-goods transactions, see subsection (h) and Comment 8.) Some courts have found this rule to be explicit or implicit in the words "to the extent," found in former Section 9-107 and continued in subsections (b)(1) and (b)(2). The rule is made explicit in subsection (e). For non-consumer-goods transactions, this Article rejects the "transformation" rule adopted by some cases, under which any cross-collateralization, refinancing, or the like destroys the purchase-money status entirely.

Mass. Gen. Laws ch. 106, § 9-103(f), cmt.7.

RCG funded Inofin's purchase of Retail Installment Sale Agreements, which in turn funded the loans from car dealers to finance customer purchases of automobiles.  In the retail installment sale contracts, the customers granted a PMSI to their lender. . . . These series of transactions were all "closely allied," . . .which permits a finding that the funds advanced by RCG created a PMSI in all its collateral.  Under the dual-status rule, just as the purchase of a loan through a refinancing does not destroy the original PMSI, neither did RCG's purchase of the chattel paper destroy the PMSI.  As such, RCG has a PMSI over the RCG Portfolio to the extent of the original financing amount for the underlying vehicles.  The total amount financed equals the amount of RCG's loans.  As such, RCG is fully secured through its dual-status PMSI.

The Trustee, on the other hand, maintains that RCG cannot invoke the "dual-status rule" and has misstated the law.  He states:  "[t]he 'dual-status' rule does not allow a creditor to have a PMSI in 'mixed collateral.'  The 'dual-status' rule allows a creditor to have a 'mixed security interest' in non-consumer goods, which may be part purchase-money and part non-purchase money."  He adds that UCC § 9-103, cmt. 7 "is clear that the 'dual status' rule is 'applicable *only to non-consumer-goods transactions.*"  (emphasis supplied). *See also* Mass. Gen. Laws ch. 106, § 9-103, cmt. 8.  The Trustee observes that RCG is relying on a purported PMSI in the underlying vehicles purchased by consumers from dealers which are clearly consumer goods and, thus, RCG is not entitled to the benefits of the "dual status" rule.  Distinguishing the cases cited by RCG, the Trustee maintains that RCG simply does not have a security interest in the underlying motor vehicles and failed to prove that any of its loan proceeds actually funded Inofin's purchase of Retail Installment Sale Contracts that were assigned to RCG or that RCG loan proceeds financed the purchase of the vehicles by the consumer buyers.  The Trustee also rejects RCG's assertion that the weekly Allonge packages were "closely allied" because the age of the

49

installment contracts delivered to RCG were purchased by the Debtor two days, two weeks, two months or two years before RCG's weekly advances.  Moreover, the Trustee points out that RCG failed to reconcile how it could have a PMSI "to the extent of the financing provided to the consumers to fund their automobile purchases" while not being listed as the lien holder on the certificates of title to the vehicles.  *See* Mass. Gen. Laws ch. 90D, §§ 21, 22, and 26 and Mass. Gen. Laws ch. 106, § 9-303.  Finally, the Trustee emphasizes that PMSI's are specifically limited to "goods" and "software," thus rendering RCG's argument meritless as  it did not obtain a security interest in goods pursuant to the 1996 Security Agreement.

The requirements for a PMSI are set forth in Section 9-103 of the UCC which defines "purchase money collateral" as "goods."  Section 9-103 further provides in relevant part:

> (b) Purchase-money security interest in *goods*. A security interest in goods is a purchase-money security interest:
>
> > (1) to the extent that the goods are purchase-money collateral with respect to that security interest;
> >
> > (2) if the security interest is in inventory that is or was purchase-money collateral, also to the extent that the security interest secures a purchase-money obligation incurred with respect to other inventory in which the secured party holds or held a purchase-money security interest; and
> >
> > (3) also to the extent that the security interest secures a purchase-money obligation incurred with respect to software in which the secured party holds or held a purchase-money security interest.

Mass. Gen. Laws ch. 106, § 9-103(b) (emphasis supplied).

50

"Goods" means all things that are movable when a security interest attaches. The term includes (i) fixtures, (ii) standing timber that is to be cut and removed under a conveyance or contract for sale, (iii) the unborn young of animals, (iv) crops grown, growing, or to be grown, even if the crops are produced on trees, vines, or bushes, and (v) manufactured homes. The term also includes a computer program embedded in goods and any supporting information provided in connection with a transaction relating to the program if (i) the program is associated with the goods in such a manner that it customarily is considered part of the goods, or (ii) by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods. The term does not include a computer program embedded in goods that consist solely of the medium in which the program is embedded. *The term also does not include* accounts, *chattel paper*, commercial tort claims, deposit accounts, documents, general intangibles, *instruments*, investment property, letter-of-credit rights, letters of credit, money, or oil, gas, or other minerals before extraction.

Mass. Gen. Laws ch. 106, § 9-102(44).

In view of the plain language of the Security Agreement and Loan Agreements, the absence of any reference to "goods" and the underlying PMSI in consumer goods obtained by the dealers, RCG's argument as to the applicability of the "dual-status" rule lacks merit. Not only do the cases cited by RCG fail to address circumstances analogous to those present in the instant case, *see* Gen. Elec. Capital Commercial Automotive Fin., Inc. v. Spartan Motors, Ltd., 246 A.D.2d 41, 675 N.Y.S.2d 626 (1998), RCG's argument is convoluted and wholly unconvincing. RCG, as a sophisticated lender, could have required that its name, together with Inofin's name, appear on the Certificate of Title to the motor vehicles purchased by consumers from dealers with whom the Debtor had a lending relationship. It did not do so.

## IV. THE MOTION FOR RELIEF FROM STAY

51

According to the United States Court of Appeals for the First Circuit <u>Grella v. Salem</u>

<u>Five Cent Savs. Bank</u>, 42 F.3d 26 (1st Cir.1994),

> The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.

<u>Id.</u> at 32.  The <u>Grella</u> court further observed:

> The statutory and procedural schemes, the legislative history, and the case law all direct that the hearing on a motion to lift the stay is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims. Rather, it is analogous to a preliminary injunction hearing, requiring a speedy and necessarily cursory determination of the reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property. If a court finds that likelihood to exist, this is not a determination of the validity of those claims, but merely a grant of permission from the court allowing that creditor to litigate its substantive claims elsewhere without violating the automatic stay.

<u>Id.</u> at 33.

RCG has moved for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and

(2).[23] Its motion is predicated on its status as the holder of a secured claim and the validity

---

[23] Section 362(d) provides in relevant part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

> (2) with respect to a stay of an act against property under

of its foreclosure sales conducted on January 18, 2011 and January 26, 2011. For the reasons set forth above, the Court has determined that RCG's Security Agreement dated April 17, 1996 did not provide it with an enforceable security interest in chattel paper and instruments. Moreover, the Court concludes that the Loan Modification Agreement failed to provide RCG with an enforceable security interest in Retail Installment Contracts delivered to it after October 1, 2010. Because the loan proceeds advanced by RCG cannot be traced to its purported collateral, the Court finds that its security interest did not attach and is not enforceable as to that collateral and that its possession of the Retail Installment Sale Contracts by reason of the Allonge assignments did not establish independent security agreements. In addition, the Court finds that RCG did not obtain a PMSI in consumer automobiles. In short, RCG failed to establish a colorable claim to secured status and concomitantly failed to establish entitlement to relief from the automatic stay.

In its Motion, RCG requested a determination that its portfolio was not property of the bankruptcy estate, *see* 11 U.S.C. § 541(a), as it was the owner of the portfolio by virtue of its foreclosure sale. Because this Court has determined that the foreclosure sales were not conducted in a commercially reasonable manner, this Court finds that the loan

---

subsection (a) of this section, if--

(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization . . . .

11 U.S.C. § 362(d)(1) and (2).

53

portfolio, in particular the Retail Installment Sale Contracts, are property of the estate and that RCG is not entitled to relief from the automatic stay "for cause" under 11 U.S.C. § 362(d)(1).

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order denying the Motion of Raymond C. Green, Inc. for Relief from the Automatic Stay and for Related Relief.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  July 27, 2011